UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


UNITED STATES OF AMERICA,     )
       )
          Plaintiff,     )
       )
     vs.     )
       )     Case No. 4:06CR00274 SNL (AGF)
MISAEL BENITEZ,     )
       )
          Defendant.     )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the pretrial motion filed by Defendant, Misael

Benitez. Pretrial matters were referred to the undersigned United States Magistrate Judge

under 28 U.S.C. § 636(b). Defendant filed a motion to suppress evidence and statements.

(Doc. No. 22). An evidentiary hearing was held on May 26, 2006. The government was

represented by Assistant United States Attorney James C. Delworth. Defendant was

present and represented by his attorney, Jane C. Hogan. At the hearing, the government

presented the testimony of Grant Jansen, who has been a police officer with the City of

St. Charles for ten years, and Special Agent (SA) Matt McKnight, who has been

employed with the Drug Enforcement Agency (DEA) for three years. The witnesses

were cross-examined extensively by defense counsel. The parties were given leave to file

post-hearing memoranda, after which the matter was taken under submission. Trial is

scheduled for July 24, 2006.

Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

On the morning of April 11, 2006, Officer Grant Jansen was on duty, assigned to traffic enforcement. He was in an unmarked car equipped with lights and radar and was wearing his police uniform. Officer Jansen is also a certified canine handler, and he had his drug dog, Czar, in his vehicle. At approximately 8:35-8:40 a.m., while stationed on the shoulder of eastbound Highway 70, between Zumbell and Highway 94, Officer Jansen observed a 2000 Chevrolet Suburban in the left-hand lane of eastbound Highway 70, which appeared to be exceeding the speed limit. He activated his radar, which had been in standby mode, and the radar showed the car was traveling at 75 mph, which was 15 mph in excess of the 60 mph speed limit.

He merged onto the highway and was able to catch up to the vehicle after Highway 94 (also known as First Capitol). As he approached, the car crossed into the center lane, and he saw that the Suburban was following the car in front at an unsafe distance and often had to put on its brakes to avoid hitting the car in front. The Suburban then returned to the left lane and passed the car it had been tailgating. Officer Jansen was able to pace the car and determined that its speed varied from between 70-80 miles per hour. After passing Fifth Street and before crossing the Blanchette Bridge, Officer Jansen activated his lights and curbed the vehicle just past the bridge. He had not

activated his lights sooner because he determined there was no safe place to curb the vehicle earlier. There was construction near First Capitol Drive and no shoulder on the bridge. While there is a curb at 5th Street, the stretch of curb there is very short, and Officer Jansen did not believe he could curb the car safely there, inasmuch as they would need to cross over from the left-hand lane. Once under the superstructure of the Blanchette Bridge, the jurisdiction of the City of St. Charles ends and the jurisdiction of St. Louis County begins. As such, Officer Jansen activated his lights within the City of St. Charles, but actually curbed the Suburban outside the limits of the City of St. Charles.

After he curbed the vehicle, Officer Jansen exited and approached the passenger side of the vehicle. Defendant Misael Benitez was driving the vehicle, and there was a female passenger. The Suburban had Indiana license plates, and was pulling a 1996 Mercury Cougar with Illinois license plates, on a dolly. Officer Jansen identified himself and advised Defendant why he had pulled him over. Defendant stated that he believed the speed limit was 70 mph and, with respect to the tailgating, stated that he was trying to get around the car. Officer Jansen, who does not speak Spanish, explained this to Defendant in English, and he did not have any problem understanding Defendant's answers, which were also in English.

He asked Defendant for identification, and he provided a Mexican identification card. Govt. Ex. 4. Defendant said that the Suburban belonged to his wife. In response to questions, Defendant stated that the female passenger was a friend, and that his wife was in Indianapolis. Officer Jansen asked for registration, and Defendant provided

registration that showed the owner was Amy Salinas, whom he said was his wife. Officer Jansen noticed that the last name on the registration was not the same as the name on Defendant's identification card. At some point soon after the stop, he asked Defendant to exit the car, and asked him to go to the back of the car for further discussion. In response to a question about his destination, Defendant said he was coming from Denver and returning to Indianapolis. He said he had been in Denver for less than a day. When asked why he went to Denver, Defendant said that he had gone there to pick up the vehicle he was towing. When asked if he had bought the vehicle, Defendant said he got it for free. In response to the officer's questions, Defendant said he had gotten the car from a friend, but when asked the friend's name, he could not say, and stated that his wife had told him to pick the car up from her friend. He said he could not remember the name of the person from whom he got the car or from where he had picked the car up.

Officer Jansen told Defendant that his answers sounded suspicious, and Defendant said something like, "Yes, I know they sound suspicious." When asked why he got the car for free, Defendant responded that his wife had told him to go to Denver to pick up the car. When asked why the friend did not drive the car there, Defendant stated that the car had problems and was not operable. At first when asked, Defendant stated that he did not go anywhere else in Denver other than to pick up the car. Later, he said he had also gotten wheels in Denver, but could not remember where he got the wheels. He said he got them from a friend, but could not remember the friend's name. When asked why he had not purchased the wheels in Indianapolis, he said he got a better deal from his friend.

4

At some point, Officer Jansen spoke to the front seat passenger and asked whether she spoke English. When she said she did not, he did not attempt to ask her any further questions.

In light of Defendant's answers and his inability to provide details regarding the trip, Officer Jansen believed that Defendant was engaged in some type of criminal activity. He asked if Defendant was carrying any illegal contraband, and he said, "No. If you want to search, go ahead." He advised Defendant that he wanted to search the vehicles, and also advised him that he had the right to refuse to consent to a search. Defendant indicated he understood and responded, "Go ahead. Tear it up." At the time of the request, Officer Jansen did not have his firearm drawn, and no promises or threats were made to elicit Defendant's consent to search. Defendant, who was 26 years old at the time, appeared to be of normal intelligence and did not appear to be under the influence of drugs or alcohol. He appeared to understand the questions being asked of him, and Officer Jansen did not have any problem understanding Defendant's responses.

Because he prefers not to search cars when he is alone, Officer Jansen called Officer Todd Wilson, also with the St. Charles City Police, advised him of the situation, and asked him to assist. At some point, Officer Wilson also contacted the St. Louis County Drug Task Force for assistance. Officer Wilson, who was nearby at the time, arrived 2-5 minutes later, and Officer Jansen began searching the Cougar, which was empty. He looked through the window of the car and did a visual inspection, but did not find anything. He then retrieved his drug dog, Czar, who is certified by the U.S. Police

Work and Dog Association. Officer Jansen has been his handler for almost three years, and they engage in training twice a month. Czar aggressively alerts by scratching. Officer Jansen continued his search with Czar, who alerted to the glove compartment. Officer Jansen searched the glove compartment of the car, but did not find anything. He did not assume from this that Czar had made a mistake, as he was aware that the odor of narcotics may persist after the narcotics have been removed.

Officer Jansen completed a search of the Cougar and then went to the back of the Suburban and opened the back door. The back of the car was tightly packed with items including four rims and tires, a bumper, a grill from a car, travel bags, and a cooler. He was uncomfortable searching the car on the shoulder of the highway due to the number of items in the car that would have to be taken out alongside the highway and the time it would take. By this time, SA Ed Vitt, SA Matt McKnight, and other officers from the St. Louis County Drug Task Force had arrived, so that there were a total of approximately six or seven officers at the scene. SA Vitt suggested they move the car to another location, and asked Defendant if it was okay to move the car and explained why. Defendant agreed. Officer Jansen estimated that from the time of the initial stop until they moved the cars, they were on the shoulder of the highway for approximately 30 minutes.

They got back in their vehicles and exited at the Earth City Expressway exit, which is the next exit on the highway, approximately 1/4 of a mile from the place of the stop. Officer Jansen believed that Defendant drove his own vehicle, but it is possible

someone else drove the Suburban. They drove to a parking lot at 3400 South Rider Trail, which was about 1/4 mile from the exit, where the search of the Suburban proceeded. While the search was conducted, Defendant was not placed in handcuffs or restrained in any fashion. At one point during the search, one of the Task Force Agents advised Defendant and his friend that if they were thirsty or hungry, they could go to a nearby gas station to get something to drink or eat. At some point during the search, SA McKnight also contacted a Spanish-speaking agent on his cell phone. He then gave Defendant the cell phone, told him that a Spanish-speaking law enforcement officer was on the line, and allowed him to speak to the Spanish-speaking agent. This was done in an effort to build better comradery. SA McKnight spoke to the agent following the call, and learned that Defendant told him the same thing he had previously told the officers. Defendant did not at any time object to the search or request that it be discontinued, nor did he request a lawyer or ask to leave the scene.

Under the hood of the Suburban, in front of the radiator, the officers located five suspicious-looking packages that were wrapped in black duct tape. Based on his experience, Officer Jansen believed they were narcotics. The packages were presented to SA McKnight, who took possession of them. SA McKnight placed Defendant under arrest and put him in handcuffs. One of the packages was field tested and tested positive for methamphetamine. Officer Jansen estimated that they were at the Rider Trails location for approximately 30-60 minutes. At this point the investigation was turned over to the DEA.

SA McKnight took custody of Defendant at the scene and asked him if he wanted an opportunity to help himself. He said yes, and SA McKnight drove him to the DEA headquarters in downtown St. Louis. He did not advise Defendant of his rights at the time. They engaged in some conversation in English in the car, mostly initiated by Defendant. Defendant stated that he needed to call his wife and tell her he had been stopped, otherwise some harm might come her way.

At DEA headquarters, Defendant was taken to an interview room. He was not placed in handcuffs or otherwise restrained. The only persons in the room with Defendant were SA McKnight and SA Brian Whitlock, who speaks Spanish. Defendant was presented a DEA <u>Miranda</u> warning and waiver form, in Spanish, which was read to him in Spanish by SA Whitlock. Defendant said he understood and initialed each of the paragraphs of the form, indicating that he understood his rights. He then signed the warning and waiver form. Govt. Ex. 1. SA McKnight also presented Defendant with a Prompt Presentment and Waiver form, which was in English, and asked whether he wanted to cooperate in the investigation. Govt. Ex. 2. SA McKnight reviewed the form with Defendant by reading certain portions to him in English, and also had him review the form himself. Defendant said he understood and was willing to waive his rights, and he then signed this form as well.

Defendant was then interviewed by the two agents. No promises or threats were made to induce Defendant's waiver or statements. Most of the questioning was conducted by SA Whitlock, and most was in Spanish, though some was in English.

When the questioning was in English, Defendant at times responded in English and at times looked to SA Whitlock and responded in Spanish. At some point, Defendant was allowed to make a telephone call, and he called his wife. Defendant did offer to cooperate, but his cooperation did not pan out. Defendant was then returned to the St. Charles Police Department for overnight custody.

The next morning, SA McKnight picked Defendant up in St. Charles. Officer Jansen had issued two traffic citations to Defendant for following too closely behind another vehicle and for speeding, which he gave to SA McKnight, who in turn, gave them to Defendant. Govt. Ex. 3. SA McKnight then transported Defendant to the U.S. Marshal. They engaged in small talk, but did not discuss anything related to the investigation.

## CONCLUSIONS OF LAW

### A.  The Vehicle Stop

### 1.  Authority for Extra-Jurisdictional Stop

Defendant first argues that Officer Jansen lacked authority to stop Defendant's vehicle because the stop occurred outside the limits of the City of St. Charles. Both parties assert, and the Court agrees, that Mo. Rev. Stat. § 544.157 governs extra-jurisdictional arrests by St. Charles City police officers. Mo. Rev. Stat. § 544.157, in pertinent part provides:

> 1.  Any law enforcement officer certified pursuant to chapter 590, RSMo, of any political subdivision of this state . . . in fresh pursuit of a person . . . who has committed, or attempted to commit, in the presence of such officer

or agent, any criminal offense or violation of a municipal or county ordinance . . . shall have the authority to arrest and hold in custody such person anywhere in this state.  Fresh pursuit may only be initiated from within the pursuing police officer's . . . jurisdiction and shall be terminated once the pursuing peace officer is outside of such officer's jurisdiction and has lost contact with the person being pursued.  If the offense is a traffic violation, the uniform traffic ticket shall be used as if the violator has been apprehended in the municipality or county in which the offense occurred.

\* \* \*

3.  The term "fresh pursuit" as used in this section, shall include hot or fresh pursuit as defined by the common law and also the pursuit of a person . . . who has committed or attempted to commit in this state a criminal offense or violation of municipal or county ordinance in the presence of the arresting officer referred to in subsection 1 of this section . . . .  "Fresh pursuit" as used herein shall imply instant pursuit.

From the plain language of the statute, it is clear that Officer Jansen was authorized to conduct a stop anywhere in the state of any person whom he observed commit a violation of any municipal or county ordinance, including a traffic violation, so long as (i) he was "in fresh pursuit" of the individual, (ii) initiated the pursuit from within his jurisdiction, and (iii) effected the stop prior to losing contact with the person being pursued.  Mo. Rev. Stat. § 544.157.1.  Although Defendant asserts that "fresh pursuit" is limited to a hot pursuit under common law, the statute again makes plain that a "fresh pursuit" also includes the pursuit of a person who has committed or attempted to commit such a violation in the presence of the arresting officer.  Mo. Rev. Stat. § 544.157.3.  See City of Ash Grove v. Christian, 949 S.W.2d 259, 261 (Mo. App. 1997) (certified municipal police officer, when in "fresh pursuit" of person whom he has seen commit a violation of a municipal ordinance may effectuate arrest outside of municipality's city

limits).

Defendant cites <u>City of Fredericktown v. Bell</u>, 761 S.W.2d 715 (Mo. App. 1988) in support of his assertion that Officer Jansen lacked the authority for an extra-jurisdictional arrest, but as the government correctly notes, the holding in that case has no application here.  At issue in <u>Fredericktown</u> was the authority of an officer of a fourth class city to effect an arrest outside the city limits when that officer observed the offense and began pursuit within the city limits.  It was clear in that case that the then-current version of § 544.157 did not apply because of the City's status as something other than a first class county with a charter form of government.  <u>Id.</u> at 716-17.  The court there simply held that "peace officers of cities of the fourth class do not have the power to make extra-jurisdictional arrests *absent application of section 544.157*."  <u>Id.</u> at 717 (emphasis added).

The Court takes judicial notice that, unlike the City of Fredericktown, the City of St. Charles is a charter city under the Missouri Constitution.  Its officers are required to be certified and hold Class A licenses pursuant to Chapter 590, Mo. Rev. Stat., and the regulations issued pursuant thereto.  <u>See</u> Mo. Rev. Stat. § 590.020; 11 Mo. ADC, CSR 75-13.010 (requiring Class A license for first class county with a charter form of government and a political subdivision located within a first class county with a charter form of government).  As Defendant has conceded, here the authority for the stop is governed by § 544.157.

Whether an arrest is "valid under the doctrine of fresh pursuit is generally determined upon an examination of the facts and circumstances of each case." Ash Grove, 949 S.W.2d at 262. To show a "fresh pursuit" with regard to a traffic offense committed within the officer's observation, the "police pursuit must be initiated within the peace officers' jurisdiction, must be immediate and without delay, consistent with reasonable police safety practices, and should be accompanied with a purpose to stop the vehicle." Id. at 264.

Here, Officer Jansen's actions met all of the requirements. He observed two traffic violations within his jurisdiction. Inasmuch as he initiated the stop and activated his lights before crossing the bridge, he in fact initiated the stop within his jurisdiction. Defendant argues that Officer Jansen unnecessarily delayed the stop, but under these facts it is clear that he initiated promptly after he was able to pace Defendant's car and as soon thereafter as it was safe to do so. There is also no question that he acted with a purpose to stop the vehicle. As such, Officer Jansen was authorized under Mo. Rev. Stat. § 544.157 to stop Defendant for the traffic violations, even though the actual stop occurred immediately outside the jurisdiction of the City of St. Charles.

**2. Validity and Scope of the Stop**

Defendant asserts that even if Officer Jansen was authorized to make the stop, the questioning and searches that followed were not based on reasonable and articulable suspicion that criminal activity was afoot. Defendant does not appear to challenge the initial probable cause for the stop, and the law is clear in this regard. When a police

officer observes a traffic violation – however minor – he has probable cause to stop the vehicle. Whren v. United States, 517 U.S. 806, 818 (1996); United States v. Martin, 411 F.3d 998, 1000 (8th Cir. 2005). Here, the evidence is undisputed that Officer Jansen observed Defendant both speeding and following too closely behind another car. As such, he had probable cause to stop the car.

Once an officer has a right to stop a driver, the officer may "conduct an investigation 'reasonably related in scope to the circumstances that justified the interference in the first place.'" United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994) (quoting United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990)). "This reasonable investigation includes asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose." Id.; United States v. Jones, 269 F.3d 919, 924-5 (8th Cir. 2001). Officer Jansen was therefore authorized to request Defendant's identification and vehicle registration, ask him to step out of the vehicle, and inquire about their destination and purpose. United States v. Pulliam, 265 F.3d 736, 740 (8th Cir. 2001); United States v. Winters, 221 F.3d 1039, 1041 (8th Cir. 2000); United States v. Barahona, 990 F.2d 412, 416-7 (8th Cir. 1993).

The law is also clear that when "'the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions.'" United States v. Johnson, 58 F.3d 356, 357 (8th Cir. 1995) (quoting Barahona, 990 F.2d at 416). Police officers may

briefly detain an individual for an investigative purpose when they have a reasonable belief that "criminal activity may be afoot." <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968). The reasonable belief requires suspicion based on "'particularized, objective facts which, when taken together with rational inferences from those facts, reasonably warrant[] suspicion that a crime [is] being committed.'" <u>United States v. Beck</u>, 140 F.3d 1129, 1136 (8th Cir. 1998) (quoting <u>United States v. Martin</u>, 706 F.2d 263, 265 (8th Cir. 1983)).

When an officer develops reasonable, articulable suspicion of criminal activity during a traffic stop, he is justified in making a greater intrusion unrelated to the traffic offense. <u>United States v. Pereira-Munoz</u>, 59 F.3d 788, 791 (8th Cir. 1995); <u>Bloomfield</u>, 40 F.3d at 918. Officers are "permitted 'to graduate their responses to the demands of the particular situation.'" <u>Pereira-Munoz</u>, at 791 (quoting <u>United States v. Place</u>, 462 U.S. 696, 710 n.10 (1983)). The reasonable suspicion is assessed in light of the totality of the circumstances, taking into consideration the officers' experience. <u>Id.</u>

> The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. . . . [A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

<u>Florida v. Royer</u>, 460 U.S. 491, 500 (1983). <u>See</u> <u>Bloomfield</u> at 916; <u>United States v. Willis</u>, 967 F.2d 1220, 1224 (8th Cir. 1992).

The Court rejects Defendant's contention that Officer Jansen expanded the scope of the traffic stop without reasonable suspicion. His suspicion was not based solely on the difference between his own last name and the name on the registration, whom Defendant identified as his wife, as Defendant contends. This was but a single and minor factor. Defendant said he had gone to Denver to pick up the car he was towing, and stated that he got the car for free from a friend. He could not, however, identify the friend's name, and then said his wife told him to pick up the car from one of her friends. He gave inconsistent statements about where he had gone in Denver, and then stated that he had also gotten the wheels from a friend in Denver, but also could not remember this friend's name or identify the location at which he had gotten the wheels. Even Defendant admitted to Officer Jansen that his answers sounded suspicious. Although Defendant attempts to explain these responses as attributable to a language barrier, there is no basis on this record for such a conclusion. Both Officer Jansen and SA McKnight were able to converse easily with Defendant in English.

In light of these facts, it was reasonable for Officer Jansen to detain Defendant for further inquiry and to request consent to search. United States v. Blaylock, 421 F.3d 758, 769 (8th Cir. 2005) (passenger's extreme nervousness, combined with presence of masking odors, contradictory statements, and driver's vague reasons for trip, provided reasonable cause to detain vehicle for canine search), cert. denied, 126 S.Ct. 1108 (2006); accord United States v. Sanchez, 417 F.3d 971, 975-76 (8th Cir. 2005); United States v. Poulack, 236 F.3d 932, 935-6 (8th Cir.), cert. denied, 534 U.S. 864 (2001); United States

v. Lyton, 161 F.3d 1168, 1170-71 (8th Cir. 1998). See also United States v. Yang, 345 F.3d 650, 654 (8th Cir. 2003) ("the time it takes for an officer to find out if consent will be given cannot be an unlawful detention in the absence of coercive or otherwise unusual circumstances"), cert. denied, 541 U.S. 952 (2004). With or without consent to search, it was also reasonable for Officer Jansen to further extend the scope of the stop to use his canine, which was in his vehicle. See Martin, 411 F.3d at 1002 (brief delay to conduct canine sniff does not violate Fourth Amendment even where delay is after conclusion of traffic stop). The canine's alert to the glove compartment area of the Cougar provided further cause to extend the search. Although no narcotics were found, Officer Jansen explained that the odor of narcotics can persist for some time after narcotics are removed.

Because Officer Jansen's investigative detention did not violate the Fourth Amendment, Defendant's argument that the search was the product of an illegal seizure has no merit. Lyton, 161 F.3d at 1171; United States v. Miller, 20 F.3d 926, 930 (8th Cir. 1994).

## B. Consent to Search

It is the prosecution's burden to prove by a preponderance of the evidence that a consent to search was freely given. United States v. White, 81 F.3d 775, 780 (8th Cir.) cert. denied, 519 U.S. 1011 (1996); Miller, 20 F.3d at 930. The consent, however, need not necessarily be knowing and intelligent. Schneckloth v. Bustamonte, 412 U.S. 218, 241 (1973). One need not be aware of his or her right to consent in order to make the consent voluntary. United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990).

16

A consent is voluntary if it is the product of free choice, the defendant's will is not overborne, and the consent is not given under coercion or duress. In determining whether the prosecution has met its burden, courts look to both the characteristics of the accused and the details of the environment in which the consent was given. <u>Chaidez</u>, 906 F.2d at 381. Voluntariness is a fact question to be determined from the totality of the circumstances present. <u>Schneckloth</u>, 412 U.S. at 226-227; <u>United States v. Matlock</u>, 415 U.S. 164 (1964). The factors to be considered in determining whether consent is voluntary include:

> (1) the defendant's age; (2) the defendant's general intelligence and education; (3) whether the defendant was under the influence of drugs or alcohol; (4) whether the defendant was informed of his Miranda rights prior to the consent; and (5) whether the defendant had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals.

<u>Alcantar</u>, 271 F.3d at 737. <u>See</u> <u>United States v. Hathcock</u>, 103 F.3d 715, 719-20 (8th Cir. 1997); <u>Chaidez</u>, 906 F.2d at 381. Among the factors to be considered in examining the environment surrounding the consent, courts examine: the length of time a person is detained and questioned; whether the person was threatened, physically intimidated, or punished by the police; whether the defendant relied upon promises or misrepresentations made by the police; whether the defendant was in custody; whether the consent occurred in a public or secluded location; and whether the defendant objected to the search or stood silently by while the search occurred. <u>United States v. Smith</u>, 260 F.3d 922, 924 (8th Cir. 2001); <u>Chaidez</u> at 381. The foregoing factors are not to be applied

mechanically, and no single factor is dispositive. <u>Schneckloth</u>, 412 U.S. at 226-27; <u>Chaidez</u>, at 381.

Applying the above factors, the government has met its burden to establish that the consent was voluntary. On this record there is nothing to suggest that Defendant's will was overborne. <u>Poulack</u>, 236 F.3d at 936; <u>Miller</u>, 20 F.3d at 930. Per the court file, at the time of the incident, Defendant was 26 years old. Defendant did not appear to be under the influence of any drugs or narcotics, appeared to understand what was being said, and provided responsive answers. Indeed, it was Defendant who first suggested that the officer could go ahead and search, and he was thereafter expressly advised that he did not have to consent to search. The encounter took place during normal daylight hours, in a public area, and only a few minutes passed from the time of the stop until consent was given. At the time the consent was given, there was only a single officer present, and no threats or promises were made to induce Defendant to consent. While Officer Jansen did not advise Defendant of his <u>Miranda</u> rights at this time, such advice is not required for a valid consent to search, especially where, as here, Defendant has been advised of his right to withhold consent. <u>United States v. Montano-Gudino</u>, 309 F.3d 501, 504 (8th Cir. 2002); <u>Lyton</u>, 161 F.3d at 1171; <u>United States v. Payne</u>, 119 F.3d 637, 643-44 (8th Cir. 1997). As in <u>Montano-Gudino</u>, "there is no evidence other than the detention itself that the consent was not freely and voluntarily given." <u>Id.</u>

Defendant thereafter agreed to permit the officers to move his vehicles to a safer place to conduct the search. Defendant asserts that when the canine alerted to the glove

compartment of the Cougar, but no narcotics were found, the officers were required to terminate his search. But this is unfounded for two reasons. First, as set forth above, the record contains undisputed testimony that the odor of narcotics can remain for some time after they are removed. Second, Officer Jansen at that point had not even begun to examine the Suburban that Defendant was driving. Nor did the consent search somehow become invalid because of the time it took to conduct the search. At most, 60-90 minutes passed from the time of the initial stop until the narcotics were discovered. While the search was being conducted, Defendant was not restrained and was even advised he could leave the immediate area to get something to eat. He elected to remain at the scene, and at no time while the search was being conducted did Defendant voice any objections or request that they stop their search.

Based on the totality of the circumstances surrounding the encounter, the Court concludes that Defendant voluntarily consented to a search of the vehicles. See White, 81 F.3d at 780. Even if there were some question regarding whether Defendant actually consented to the search, on these facts the Court further finds that the officers reasonably believed Defendant consented to the search. See United States v. Sanchez, 156 F.3d 875, 878 (8th Cir. 1998) ("the Fourth Amendment requires only that the police reasonably believe the search to be consensual.")

**C. Statements Made by Defendant**

Defendant first seeks to suppress the oral statements he made, contending they were the product of an unlawful seizure and search. The Court rejects this argument,

19

having found the stop, the detention, and the search to be valid. Defendant further asserts, more generally, that the statements were not voluntary and were the product of coercion.

A defendant may knowingly and intelligently waive his rights and agree to answer questions. Miranda v. Arizona, 384 U.S. 436, 479 (1966). When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing, and intelligent waiver of Miranda rights by the defendant. Colorado v. Connelly, 479 U.S. 157 (1986). The court must examine the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception, and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it. Moran v. Burbine, 475 U.S. 412 (1986). The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne. Connelly, 479 U.S. at 170; Haynes v. Washington, 373 U.S. 503 (1963). "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry." Dickerson v. United States, 530 U.S. 428, 444 (2000). As the Supreme Court has recognized, however, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda, are rare." Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984). See Dickerson, 530 U.S. at

444.

Although the parties address all of Defendant's statements as a group, proper analysis requires that the statements be examined independently.  The statements made at the scene, prior to the discovery of the narcotics, are not subject to suppression.  Although Defendant had not been advised of his <u>Miranda</u> rights, at the time of the search he was not in custody within the meaning of <u>Miranda</u>.  As discussed above, Defendant was not restrained in any fashion and was even advised he could go to a nearby service station to get something to eat or drink.  While several officers had arrived at the scene by this time, none of the officers had their weapons drawn or made any threats or promises to Defendant.  Defendant was also given the opportunity to speak to a Spanish-speaking agent on the telephone, at which time he could have further explored any questions he might have had, but Defendant simply repeated what he had previously advised the officers.  Thus, the Court finds that any statements made by Defendant prior to the discovery of the narcotics are not subject to suppression.

Immediately following his arrest, Defendant indicated that he wanted an opportunity to assist himself, and he was transported to DEA headquarters.  Although there was discussion in the car, the testimony was that most of the conversation was initiated by Defendant.  The only statement made by Defendant during the transport that was identified by either of the parties at the hearing was Defendant's statement that he needed to call his wife to tell her he had been stopped, and that otherwise some harm might come to her.  Although Defendant had not been advised of his rights under

Miranda at this time, it does not appear that this statement was in response to any interrogation. As such, it is not subject to suppression. Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980); United States v. Henderson, 770 F.2d 724, 728 (8th Cir. 1985) (discussion in nature of conversation "normally attendant to arrest and custody," not interrogation) (quoting Innis, 466 U.S. at 300-01).

At DEA headquarters, prior to making any statements, Defendant was advised of his rights in Spanish, both orally and in writing. He stated that he understood his rights, and he confirmed this understanding by initialing each of the paragraphs of the warning and waiver form. Govt. Ex. 1. He also signed a Prompt Presentment and Waiver form. Though reviewed with him in English, Defendant stated that he understood and signed this form as well. The interview that followed was conducted by only two agents, and Defendant was not restrained in any fashion. As set forth above, Defendant is an adult who did not appear to be under the influence of any drugs or alcohol, or to be impaired in any other manner. No promises or threats were made to induce Defendant's waiver or his oral statements, and he acknowledged such in his written waiver. During the interrogation, he was also permitted to telephone his wife. Although the specific statements made by Defendant during this interview were not identified, Defendant did offer his cooperation, but it apparently did not turn out to be productive. As such, based on the totality of the circumstances, the Court finds Defendant knowingly and voluntarily waived his rights and made a voluntary oral statement.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements [Doc. No. 22] be **denied**.

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir.1990).

_____
AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 10th day of July, 2006.